**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JOLEEN K. YOUNGERS, as limited
conservator for MAX MITNIK; and
MICHAEL MITNIK, individually, and as
Personal Representative of the Estate of
Wanda Mitnik, Deceased,

        Plaintiffs,

        v.                                    Civ. No. 23-426 SCY/JMR

CITY OF ALBUQUERQUE, a New Mexico
municipality; and JOSE RUIZ, in his
individual capacity,

        Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

      Officer Ruiz responded to a 911 call stating that Max Mitnik, who is diagnosed with

schizophrenia, wanted to be transported to the hospital by police because he was afraid of hurting

his parents. Officers Ruiz and Eylicio arrived at the scene and spent roughly 15 minutes outside

talking to Max and his parents, during which everyone present remained calm and nonviolent.

Max and his mother, Wanda, went back into the house, and Officer Ruiz heard Wanda call for

help. Officer Ruiz went into the home and found Wanda trying to open a bathroom door. He told

her not to open it. Wanda stated that Max was inside, had a knife, and was stabbing at his neck.

Officer Ruiz said "okay" and Wanda opened the bathroom door. Max emerged from the

bathroom, holding a knife at his side. He raised the knife slightly to waist level, asked Officer

Ruiz to kill him, and started to walk towards Officer Ruiz. Officer Ruiz drew his firearm and

backed into a small bedroom. In total, Max advanced four to five steps without stopping. When

Max was within three to five feet of Officer Ruiz, who asserts he could not retreat any farther,

Officer Ruiz shot Max twice in the head. Although Max survived, he suffered serious permanent injuries.

Officer Ruiz asserts that qualified immunity shields him from Plaintiffs' constitutional claims. He argues that a reasonable officer in his situation would have believed Max presented a threat to the officer, justifying the use of deadly force. In addition, he argues that no clearly established law existed at the time of the shooting to put him on notice that his use of deadly force would be unconstitutional. The Court agrees with Officer Ruiz that no clearly established law existed to put him on notice that an officer cannot use deadly force against a knife-wielder who comes within three to five feet of the officer and continues to advance while the officer retreats. Consequently, the Court grants Officer Ruiz's motion for qualified immunity.

The City of Albuquerque moves for summary judgment on the grounds that no municipal policy or custom caused a deprivation of constitutional rights, even assuming such deprivation occurred. The Court agrees that Plaintiffs fail to show sufficient causation between the injury asserted and the policy complained of, and grants summary judgment in the City's favor. Finally, the Court declines supplemental jurisdiction over the state-law claims and remands them to state court.

## UNDISPUTED MATERIAL FACTS

The facts are taken from Defendant Jose Ruiz's Statement of Undisputed Material Facts ("UMF No."), Doc. 26 at 2-9, and are undisputed as presented, unless indicated otherwise. The Court views the facts in the light most favorable to the non-moving party, Plaintiffs. This narrative sets forth only the events themselves and does not incorporate the parties' various disputes unrelated to the material events.

On June 4, 2020, Officer Jose Ruiz and Officer Ashalyn Eylicio responded to a 911 call at 9815 Greenbrier Rd NE located within the Tanoan Community in Albuquerque, NM. UMF No. 1. The dispatch created for this call relayed that the caller's son, Max Mitnik, was diagnosed with schizophrenia, and that the son wanted to be transported to the hospital by police because he was afraid that he may hurt his parents, Michael and Wanda Mitnik. UMF No. 2.[1] The dispatch noted that Max was diagnosed with schizoaffective disorder and had experienced mental episodes in the past, including one occasion where he had cut himself. UMF Nos. 3 & 5. However, there were no documented police reports, previous Real Time Crime Center logs, or interaction with the Crisis Intervention Team. UMF No. 3. The dispatch noted that Max had quit taking his medication the week before and had not slept in two days. UMF No. 4. Dispatch further relayed that Max was pacing back and forth and "feels as if he will become violent." UMF No. 5; *see also* Doc. 36 at 3. The dispatch noted that there were no weapons, drugs, alcohol, or injuries involved in this call. UMF No. 6.[2]

When Officer Ruiz arrived at the residence, Michael greeted him and informed him that Max wanted to go to the University of New Mexico Hospital ("UNMH") because "He, he feels he's going to hurt us." UMF No. 7. Michael told Officer Ruiz that Max had been to UNMH before; Officer Ruiz responded that they could take him to UNMH but that there have been long waits there. Doc. 36 at 4. To this, Michael reiterated: "He's been there before. It has not been a

---

[1] Because Max, Wanda, and Michael Mitnik all share the same last name, this opinion refers to them by first name for clarity.

[2] Plaintiffs purport to "admit in part" the facts related to the dispatch call, but also "deny in part" on the grounds that "the record speaks for itself." Doc. 36 at 3. Because Plaintiffs admit Officer Ruiz's descriptions of the content of the dispatch call are accurate, and do not point to any way in which the record contradicts Officer Ruiz's facts, the Court considers them undisputed in full.

long wait when he threatens violence." Doc. 36 at 4. Michael told Officer Ruiz that Max had

come to UNMH with his parents in the past but he was afraid to do that now. UMF No. 8.

Officer Eylicio arrived at the gate of the residence and introduced herself to Max, who

told her that he wanted to go to UNMH. UMF No. 9. As Max approached Officer Eylicio, she

told him to turn around because she had to check him for weapons. UMF No. 10. Max complied,

so Officer Eylicio brought both of his arms behind his back and signaled for Officer Ruiz to

handcuff him. UMF No. 11. Officer Ruiz started to handcuff Max by placing one cuff on his left

wrist. UMF No. 13. Max told Officer Ruiz that he did not want to go into handcuffs, so Officer

Ruiz removed the handcuff and told Max that it was department policy for persons being

transported by police to be handcuffed. UMF No. 14. Once the handcuff was released, Max

asked officers for time to think for a minute about what he wanted to do and the officers gave

him time. UMF No. 15.

While being given time to think about it, Max paced the driveway and front yard, shook

his head and raised his arms in apparent agitation, and wandered in and out of the officers' view.

Doc. 36 at 6; Doc. 44 at 4. Officer Ruiz expressed concern about Max's behavior and told

Michael to tell Max not to go inside the house because "it makes us very nervous." Doc. 36 at 6.

During the whole time he was contemplating what he wanted to do, Max did not threaten anyone

or himself, and he told Officer Ruiz that he was not going to be violent. UMF No. 16. Max

eventually agreed to be handcuffed with his hands in front so that he could be transported to the

hospital by police, so Officer Ruiz handcuffed him in this manner. UMF No. 17. After he was

handcuffed, Max walked towards the officers' police cars and Officer Ruiz and his parents

followed behind him. UMF No. 18.

As he approached the police vehicles, Max stopped and turned to walk back towards his residence. UMF No. 19. As Max walked back towards his home, both officers asked him if something was bothering him, but he did not respond. UMF No. 20. Once Max reached his parents, he told Officer Ruiz that he did not want to go there (to the hospital) so Officer Ruiz told Max to let him take off the handcuffs. UMF No. 21. Before Officer Ruiz removed the handcuffs, Max asked him "What happens if I get violent there?" (again referring to the hospital), and asked whether hospital security was going to hurt him. Doc. 36 at 7. Officer Ruiz removed the handcuffs after Max agreed to allow Officer Ruiz to take them off. UMF No. 22. Max's parents still tried to convince him to go to the hospital as Officer Ruiz was removing the handcuffs. UMF No. 23. Officer Eylicio suggested everyone stop talking and give Max some more time to think. UMF No. 24.[3]

After the handcuffs were removed, Max went inside his residence and Wanda followed him inside, while Michael continued to talk with the officers. UMF No. 25. Michael said that they have "been doing this for 3 days," and Officer Ruiz stated that because Max is an adult, he cannot force him to go to the hospital. UMF No. 26. (At the time, Max was 26 years old. UMF No. 27.) Michael again told Officer Ruiz that if Max threatens violence and begs to go to the hospital, in the past, they admitted him right away. UMF No. 29. Michael explained that Max had cut himself once and was admitted to the hospital. UMF No. 30.

---

[3] Plaintiffs cite various police policies and expert opinions to support several of their arguments—e.g., Max lacked capacity to think about his decision; and the officers should have forcibly transported him to the hospital. Doc. 36 at 7. Plaintiffs also rely heavily on their expert to support their argument that Officer Ruiz's actions were unreasonable. Plaintiffs do not use these expert opinions, however, to establish disputes of material fact concerning the narrative of events. Consequently, the Court will analyze Plaintiffs' expert's opinions later, in conjunction with the Court's analysis of what a reasonable jury could conclude from the facts.

As Michael continued to speak with Officer Ruiz, Officer Eylicio contacted APD dispatch to request that a Mobile Crisis Team Unit ("MCT") come to the scene. UMF No. 31. The MCT consists of one field officer and a clinician who can assist officers in determining if a mental health transport needs to be completed and/or if the MCT can complete a Certificate of Evaluation for forced transport for an emergency mental health evaluation. UMF No. 32. Officer Eylicio informed Michael that both her and Officer Ruiz are Enhanced Crisis Intervention Trained ("ECIT") officers. UMF No. 33. Michael said that Max would not talk to a psychiatrist and that the psychiatrist recommended that ECIT officers be contacted. UMF No. 34. A psychiatrist has the ability to issue a Certificate of Evaluation for an individual to undergo an emergency mental health evaluation if the psychiatrist feels that the individual is a threat to himself or others. UMF No. 35.

Moments after Michael informed the officers that Max would not talk to the psychiatrist, Wanda yelled for help. UMF No. 36. Michael and Officer Ruiz hurried toward the Mitnik home while Officer Eylicio remained outside the home and requested "82" (assisting officers) to the scene. UMF No. 37.

Michael and Officer Ruiz looked outside the home for Wanda and did not find her; Michael then told Officer Ruiz: "In the house. Come." UMF No. 38. Wanda appeared by a screen door to the home and yelled: "Come in! Come in!" before she proceeded to another part of the house. UMF No. 39. Officer Ruiz opened the screen door, entered the home, and looked around to see what was happening. UMF No. 40. When Officer Ruiz was in a hallway, he saw Michael and asked him: "Where? Here?" UMF No. 41. Michael responded "Yeah" and then pointed to a closed door. UMF No. 41. Officer Ruiz knocked on the door and called out "Max," but no one responded. UMF No. 42. Wanda came around the corner into the hallway as Officer

Ruiz called out "Max" once again. UMF No. 43. Wanda went to unlock the door, and Officer

Ruiz told her, "No, no. Let him open it." UMF No. 44. Officer Ruiz asked her: "Did you see

anything?" UMF No. 45. Wanda responded by demonstrating towards her own neck, and stating:

"Yeah, he has a knife in his hand and he's stabbing at his neck." UMF No. 45. Officer Ruiz told

her "Okay" and stepped back while Wanda unlocked and opened the door. Doc. 36 at 10.

      When Wanda pushed the door open, Max appeared in the doorway. UMF No. 51; Def's

Ex. D (Ruiz body camera) at 15:04-05. When Max first appeared in the doorway, his right arm

was slightly behind his back and cannot be seen in the body camera footage. Def's Ex. D at

15:05; Doc. 44-5. Max began to walk towards Officer Ruiz, holding his right arm loosely down

at his side. Doc. 44-6. The parties agree that Max was holding a knife in his right hand as he

emerged from the bathroom and walked towards Officer Ruiz. UMF No. 52.

      After Wanda opened the door, Officer Ruiz said "No, no, hold on." Def's Ex. D at 15:05-

06. At the same time, Officer Ruiz drew his firearm and started backing up into a small bedroom.

Def's Ex. D at 15:07-08; Doc. 36-1 at 122:8-11. Max said in a low, calm tone: "I'm gonna suffer

a lot if I don't kill myself. Will you please kill me, sir? Kill me." UMF No. 52; Doc. 36 at 13;

Def's Ex. D at 15:06-08. Max continued walking towards Officer Ruiz and raised the knife up to

his waist. UMF No. 53. Officer Ruiz fired two shots at Max. UMF No. 56; Def's Ex. D at 15:08-

09.

      Officer Ruiz estimates that Max came within three to five feet of him when he fired.

UMF No. 54. Officer Ruiz testified he believed he could not back up any further into the

bedroom when he fired. Doc. 36-1 at 122:23-25. Officer Ruiz did not give Max a verbal warning

that force would be used against him if he did not drop the knife. UMF No. 55. In total, Max

took approximately five to six steps toward Officer Ruiz while Officer Ruiz was backing up, and

no more than five seconds passed between Wanda opening the bathroom door enough that

Officer Ruiz could see Max and Officer Ruiz firing. UMF No. 57; Def's Ex. D at 15:05 to

15:09.[4]

### STANDARD OF REVIEW

Qualified immunity protects public officials from liability "insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.

Fitzgerald*, 457 U.S. 800, 818 (1982)). When an individual defendant raises the qualified

immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-

part test. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The plaintiff must show that

1) the officer violated a constitutional or statutory right and 2) the right was clearly established

when the alleged violation occurred. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir.

2002); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). A court may address these

prongs in either order, *Pearson*, 555 U.S. at 236, but a plaintiff must satisfy both to avoid

qualified immunity, *Olsen*, 312 F.3d at 1304.

In determining whether an officer is entitled to qualified immunity, the relevant question

is not whether the officer made a mistake or whether, in retrospect, the officer should have acted

differently. "[I]t is inevitable that law enforcement officials will in some cases reasonably but

mistakenly conclude that probable cause is present, and we have indicated that in such cases

---

[4] Plaintiffs' response includes five pages of Additional Material Facts ("AMF"), all of which the
Court deems immaterial to the narrative of events as set forth above. Doc. 36 at 15-20. They
repeat facts already recited in the narrative (AMF Nos. D, G, H, M-X, EE, HH & II); are
contradicted by the video evidence (AMF No. FF); constitute legal conclusions (AMF Nos. GG
& JJ); pertain to Officer Ruiz's subjective intent (AMF No. A); describe department policies and
training (AMF Nos. B, C, E, F, I-L & Y-DD); or constitute information discovered after the use
of force (AMF No. KK).

those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Instead, the relevant inquiry is whether an officer had clear notice that the specific conduct in which the officer engaged was illegal.

A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. The action at issue need not have been previously declared unlawful, but its unlawfulness must be evident in light of preexisting law. *Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005). Except for egregious circumstances in which every reasonable officer would understand the conduct at issue to be unreasonable, unlawfulness is generally demonstrated "when there is controlling authority on point or when the clearly established weight of authority from other courts supports plaintiff's interpretation of the law." *Id.* at 1069-70 (internal quotation marks omitted). "A prior case need not have identical facts," *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017), but the precedent must make it clear "to every reasonable officer . . . that what he is doing violates that right," *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). The plaintiff bears the burden of identifying "a controlling case or robust consensus of cases" where an officer acting "under similar circumstances" to those faced by the defendants was found to have acted unlawfully. *D.C. v. Wesby*, 538 U.S. 48, 65 (2018); *Quinn v. Young*, 780 F.3d 998, 1013 (10th Cir. 2015). Furthermore, the cases so cited must clearly establish that "the scope of the right encompasses the facts presented." *Quinn*, 780 F.3d at 1012 (internal quotation marks omitted; emphasis removed).

In recent years, the Supreme Court "has issued a number of opinions reversing federal courts in qualified immunity cases." *White v. Pauly*, 80 U.S. 73, 79 (2017). "The Court has found

9

this necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *Id.* (internal quotation marks and citations omitted). "[T]he defense of qualified immunity gives public officials the benefit of legal doubts." *Donovan v. City of Milwaukee*, 17 F.3d 944, 951 (7th Cir. 1994) (internal quotation marks omitted). Thus, qualified immunity provides "ample room for mistaken judgments" and protects all but "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 314, 343 (1986).

## DISCUSSION

Plaintiffs assert Fourth Amendment claims against Officer Ruiz for excessive force in Counts I and II of the First Amended Complaint. As the Tenth Circuit long ago stated, "The excessive force inquiry includes not only the officers' actions at the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force." *Allen v. Muskogee, Okla.*, 119 F.3d 837, 840 (10th Cir. 1997). The reasonableness of an officer's actions depends both on whether force was justified at the time it was deployed and on "whether an officer's reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Flores v. Henderson*, 101 F.4th 1185, 1194 (10th Cir. 2024) (internal quotation marks omitted). In other words, even if deadly force was reasonable at the moment it was used, under Tenth Circuit law such force would still violate the constitution if the officer's conduct recklessly created the need to use deadly force. This doctrine relating to an officer's reckless conduct[5] serves as the foundation for the allegations in Count I of Plaintiffs' complaint.

---

[5] Although the parties' briefs describe this reckless conduct doctrine as the "danger-creation theory," Doc. 26 at 16; Doc. 36 at 24, the Court declines to use this term because it is frequently used to describe instances in which a public employee can be liable for the conduct of a private party. *E.g.*, *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 915 (10th Cir. 2012) (holding that a public child welfare employee creates a dangerous situation, and so could be liable, by placing

The allegations in Count II of Plaintiffs' complaint, however, do not rely on a predicate finding of recklessness. Unlike Count I, Count II simply alleges that, at the moment Officer Ruiz used deadly force, the use of such force was unreasonable.

As to Count I, Officer Ruiz argues that the reckless conduct doctrine is not good law, and even if it is, he did not engage in reckless conduct that created a dangerous situation. Doc. 26 at 17-18. Officer Ruiz does acknowledge that the Tenth Circuit has "found that an officer may be held liable for creating the need to use force." Doc. 26 at 16 (citing *Sevier v. City of Lawrence, Kansas*, in which the Tenth Circuit announced: "The reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." 60 F.3d 695, 699 (10th Cir. 1995) (footnote omitted)). But, Officer Ruiz argues, the United States Supreme Court has never adopted this legal theory. Officer Ruiz asserts that the Supreme Court's decision in *County of Los Angeles, California v. Mendez,* 581 U.S. 420 (2017), "strongly suggests they would not adopt it" and the Supreme Court's more recent decision in *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 13 (2021), "cast[s] doubt on whether the *Sevier* standard is clearly established law." Doc. 26 at 16-17.

This argument is easily dealt with. As the Supreme Court noted in *Bond*, "Tenth Circuit precedent allows an officer to be held liable for a shooting that is itself objectively reasonable if the officer's reckless or deliberate conduct created a situation requiring deadly force." 595 U.S. at 11-12. Having recognized what the clearly established law is in the Tenth Circuit, the Supreme

---

a child with foster parents the public employee knows to have been abusive to children in the past); *Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Servs.*, 959 F.2d 883 (10th Cir. 1992). In the present case, Plaintiffs are not seeking damages against a public employee for acts committed by a private party.

Court then stated, "We need not, and do not, decide . . . whether recklessly creating a situation that requires deadly force can itself violate the Fourth Amendment." *Id.* at 12. That is, as recently as 2021 (after the Supreme Court's decision in *Mendez*) the Supreme Court explicitly left the Tenth Circuit's clearly established reckless conduct rule undisturbed.

And, since the parties briefed this issue, the Tenth Circuit has issued a published decision that forecloses further debate. In *Flores v. Henderson*, the Tenth Circuit wrote, "Even though force was justified here at the time it was deployed, our cases instruct us that in assessing the second *Graham* factor, we must also consider whether an officer's reckless or deliberate conduct during the seizure unreasonably created the need to use such force." 101 F.4th 1185, 1194 (10th Cir. 2024) (internal quotation marks omitted).[6]

This quote from *Flores* also establishes that the recklessness inquiry does not truly define a separate cause of action. Instead, the recklessness inquiry takes place at the second prong of the *Graham* test to determine whether excessive force has occurred. *Id.* Nonetheless, because the parties address the issue of recklessness separately and because consideration of recklessness involves a distinct set of cases, the Court separates its analysis of the first count of Plaintiffs' complaint from its analysis of the second count.

The Court addresses Count II first and concludes that no clearly established law existed at the time of the shooting that would have put Officer Ruiz on notice that his use of deadly force was unconstitutional. Turning to Count I, Plaintiffs' reckless conduct theory similarly fails at prong two of a qualified immunity analysis. In other words, looking to Supreme Court and published Tenth Circuit decisions at the time of the shooting, it would not be clear to every

---

[6] Although *Flores* recognized controlling Tenth Circuit precedent on this issue, it also noted that a circuit split exists regarding the viability of this reckless conduct theory of liability. 101 F.4th at 1194 n.5.

reasonable officer in Officer Ruiz's position that he violated Max's constitutional rights by engaging in reckless or deliberate conduct that created the need to use deadly force.

I.      **Count II: Excessive Force**

The Fourth Amendment protects against unreasonable seizures, including the unreasonable seizure of one's person with excessive force. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). This test employs an objective standard, assessing the officer's decisions "in light of the facts and circumstances then known to him." *Scott v. United States*, 436 U.S. 128, 187 (1978). *Graham* considered "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" as relevant to the totality-of-the-circumstances analysis. 490 U.S. at 396 (citation omitted). In analyzing the second *Graham* prong (whether the suspect poses an immediate threat), the Tenth Circuit adds the "non-exhaustive factors" of "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon toward the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). All these *Graham* and *Larsen* factors guide the Court toward the ultimate question of "whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Id.* "Thus, at summary judgment, we must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).

In support of Count II, Plaintiffs rely on *Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015). However, the facts of *Tenorio* are distinguishable from the facts in the present case and so

*Tenorio* cannot serve as clearly established law for purposes of the second prong of qualified immunity. Because Plaintiffs' Count II claim fails at the second prong, the Court bypasses the first prong of the qualified immunity analysis.

When considering the second prong of qualified immunity, the Court must first define the right at issue, taking care to avoid defining it at a high level of generality. *Bond*, 595 U.S. at 12. Here, the question is whether the law clearly establishes that it is unreasonable for a police officer to use deadly force against a knife-wielder who comes within three to five feet of the officer and continues to advance as the officer retreats. In support of their excessive force claim (not predicated on a reckless conduct theory), Plaintiffs contend that the Tenth Circuit's decision in *Tenorio* provides clearly established law that put Officer Ruiz on notice that his actions were unconstitutional. Doc. 36 at 39-42. The Court thus considers *Tenorio*, as well as other relevant cases.

In *Tenorio*, officers responded to a 911 call indicating that Tenorio was intoxicated and holding a knife to his own throat. 802 F.3d at 1161-62. The 911 dispatcher also relayed to police that Tenorio had been violent in the past and was waving his knife around.[7] *Id*. at 1162. The officers arrived on the scene, one announced that he was "going lethal," and they entered through the open front door and ordered the house's occupants to step out of the kitchen with their hands up. *Id.* Tenorio emerged with a blank stare, holding a three-and-a-quarter-inch kitchen knife loosely in his right hand with his arm by his side. *Id.* at 1163. He walked at an average speed toward the officers, out of the kitchen and into the living room. *Id.* The officers shouted at him to put the knife down, and when Tenorio was about two and a half steps into the living room, an

---

[7] The person who called 911 expressed concern that Tenorio would harm Tenorio's wife, but this was not then relayed to police. *Id*. at 1162.

officer shot him. *Id.* The Tenth Circuit accepted the district court's factual finding that "the jury could find that [Tenorio] was not 'within striking distance'" of the officers at the time of the shooting. *Id.* at 1166.

"[T]he district court ruled that the record supports some potential jury findings that would establish Tenorio's claim": (1) Tenorio did not refuse to comply with the command to drop the knife but was instead given insufficient time to do so; (2) Tenorio made no hostile motions towards the officers or anyone else and merely held the knife loosely by his thigh; (3) Tenorio was shot before he was within "striking distance" of the officers; and (4) for all the officers knew, Tenorio was a threat only to himself. *Id.* at 1164-65.

The majority felt "comfortable that the evidence, viewed in this light, suffices for Tenorio's claims." *Id.* at 1165. "In fact," the majority continued, "our precedents compel this result." *Id.* It summarized:

> where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, . . . it was unreasonable for the officer to use deadly force against the suspect.

*Id.* at 1165-66 (citing *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006), as binding on its own facts). Like the knife-wielder in *Tenorio*, Max was only holding a knife and Officer Ruiz had no reason to believe he was carrying a gun. Max did not charge Officer Ruiz and made no slicing or stabbing motions with the knife he was carrying.

Further, like *Tenorio*, rather than responding to an ongoing crime, police were responding to an individual who appeared to be having a mental health crisis.[8] And, when Officer Ruiz

---

[8] The first *Graham* factor considers "the severity of the crime at issue." 490 U.S. at 396. Although *Tenorio* did not discuss this factor, the facts indicate that police were responding to a call related to a mental health crisis rather than to an ongoing crime. In the present case, Officer Ruiz argues that consideration of this first *Graham* factor supports his use of deadly force because, before he shot Max, Max committed the crime of assault with a deadly weapon. Doc. 26

arrived, he encountered a non-violent Max—during Officer Ruiz's initial fifteen-minute interaction with Max, Max manifested no violent intent. Max's first expression of violent intent was directed at himself, by stabbing himself in the neck with a knife, as his mother reported. Accordingly,, it is undisputed that, from the time police arrived until at least when Max came out of the bathroom, he had not manifested an intent to harm anyone else. These facts define similarities between *Tenorio* and the present case.

There are, however, also crucial differences. Related to the first *Larsen* factor (failure to obey commands) the district court in *Tenorio* concluded that Tenorio "was given insufficient time to" comply with any command to drop the knife. 802 F.3d at 1164. That is, it appears the district court concluded that police had enough time to warn Tenorio *and allow for reaction time* before Tenorio got so close to police that deadly force was necessary. Rather than independently review the district court's factual assessments, the Tenth Circuit began the background section of its opinion by noting that the case was coming to it on interlocutory appeal. *Id*. at 1161. Thus, it noted, "[w]e reduce the question before us to one of law by accepting the district court's assessment of the facts . . . [i]ndeed, on an interlocutory appeal from the denial of a summary-judgment motion based on qualified immunity, we are almost always barred from reviewing whether the district court erred in determining that an alleged fact was supported by sufficient evidence." *Id*. at 1161. For purposes of the present analysis, then, the Court accepts the district court's conclusion in *Tenorio* that police had sufficient time to warn Tenorio and then wait to see

---

at 14. Even if Max did assault Officer Ruiz just before the shooting, however, such assault bears on whether Max evinced hostility toward Officer Ruiz (second *Graham* factor and *Larsen* factors) rather than on the first *Graham* factor. *See Estate of Valverde by and through Padilla v. Dodge*, 967 F.3d 1049, 1061 (10th Cir. 2020) (because someone ready to attack an officer is ready to resist arrest, resisting arrest factor is insignificant and court's attention is best spent on immediate threat factor instead).

how Tenorio would react to this warning. The district court then concluded, instead of taking advantage of this time, police shot Tenorio before Tenorio could react and before any reasonable officer could conclude that the use of deadly force would be lawful. In the present case, Officer Ruiz did not have the same luxury of time the district court concluded the officers in *Tenorio* had.

Reviewing the crucial four to five seconds of the video taken before the shooting reveals the following. Wanda opens the bathroom door at timestamp 15:04. *See* Def's Ex. D (Ruiz body camera). Max immediately begins to walk forward slowly, toward the bathroom exit. At 15:05, Officer Ruiz says, albeit not loudly, "No, no, hold on." Rather than stopping, Max continues to walk forward and passes the threshold of the bathroom exit at 15:07. In the two seconds between Officer Ruiz telling Max "No, no, hold on" and Max getting just past the threshold of the bathroom door, Max says, "I am going to suffer a lot if I don't kill myself." At 15:08, the video shows Max in the hallway with the neck of the T-shirt he is wearing stretched down and a stream of blood down his neck and chest. The video also shows that Max has raised his right arm so that his forearm is at a 90-degree angle to his upper arm, and that there is a reflection from an object in Max's hand (no dispute exists that Max had a knife in his right hand at the time). Officer Ruiz has backed up to the doorway of the bedroom and is beginning to raise his gun. At 15:09, Officer Ruiz points his gun at Max (temporarily blocking the view of Max). By this time, Max has also been able to calmly say, "Will you please shoot me, sir. Kill me." Also within the set of video frames marked at 15:09, Officer Ruiz shoots Max. At this point, Max has reached the threshold of the bedroom door and Officer Ruiz has fully backed into the bedroom.

Although the 4 to 5 seconds that passed between Officer Ruiz saying "No, no, hold on" and his shooting Max is a short interval, it provided Max enough time to say, at a normal speed,

"I am going to suffer a lot if I don't kill myself. Will you please shoot me, sir. Kill me." It also provided enough time for Max to walk slowly out of the bathroom, cross the hallway, and get to the threshold of the bedroom door. To obey Officer Ruiz's command of "No, no, hold on," Max only had to not walk toward Officer Ruiz with knife in hand. That is, unlike Tenorio, Max had sufficient time to react to, and comply with, Officer Ruiz's command. Thus, *Tenorio* fails to provide a reasonable officer in Officer Ruiz's position that the shot occurred too soon after the warning given. Further, although Max clearly was suffering from mental decompensation and had a diminished capacity to reason, his request for Officer Ruiz to shoot him, followed by the imperative, "kill me" indicates that, despite his mental decompensation, Max recognized that he was in a situation implicating the use of deadly force.

Related to the second *Graham* factor (immediate threat) and second *Larsen* factor (hostility), the district court in *Tenorio* next concluded that Tenorio "made no hostile motions towards the officers or anyone else and merely held the knife loosely by his thigh." *Id.* As in *Tenorio*, a reasonable jury in the present case could conclude that, although Max raised his knife to waist level, he did not make any slicing or stabbing motions with it. Further, Max was not yelling and did not appear angry. But neither was Max behaving rationally or predictably. That is, *Tenorio* did not involve a man who had just stabbed himself in the neck with a knife, had a stream of blood running down his neck, and who advanced toward a retreating officer while saying "kill me."[9]

---

[9] In contrast to the retreating Officer Ruiz, no indication exists that the police officer in *Tenorio* made any attempt to back away from the advancing Tenorio.

Further, in attempting to retreat, Officer Ruiz backed into a bedroom with no exit. Thus, at the time of the shooting, he had no avenue of escape.[10] Doc. 28 at 2. *Tenorio* did not involve an officer being backed into a room with no avenue of escape as a knife wielder continues to advance; thus, it fails to provide notice to officers faced with such a situation that such conduct by a knife wielder cannot be interpreted as hostile.

Related to the third *Larsen* factor (the distance separating the officers and the suspect), *Tenorio* next relied heavily on the district court's conclusion that the knife-wielder was outside "striking distance" from the officers at the moment of the shooting. 802 F.3d at 1166. By comparison, in dissent, Judge Phillips estimated that Tenorio was within six feet of the officer who shot him at the time of the shooting. *Tenorio*, 802 F.3d at 1173 (Phillips, J., dissenting). Judge Phillips viewed this as well within striking distance. *Id*. However, it would not be apparent to a reasonable officer reading either the district court or Tenth Circuit majority opinion in *Tenorio* that the distance between Tenorio and the officer was no more than six feet at the time of the shooting. That is because neither the district court nor the Tenth Circuit ever estimated this distance. Indeed, to arrive at an estimate of the distance, Judge Phillips considered the dimensions of the room where the shooting occurred, estimated the minimum distance at which the police officer would have come into the room, estimated how far Tenorio had come into the room based on testimony about how many strides into the room Tenorio had taken, and then did the math. *Id*.

The majority, however, explicitly declined to engage in a similar analysis. Again, because *Tenorio* came to the Tenth Circuit on interlocutory appeal, rather than reviewing the facts, the

---

[10] That Officer Ruiz placed himself in such a situation, Plaintiffs argue, supports their reckless conduct theory, which the Court later addresses.

majority simply accepted the district court's assessment that Tenorio was not within striking distance of the officer at the time of the shooting. *Tenorio*, 802 F.3d at 1165 ("[W]e cannot second guess the district court's assessment of the evidence on this interlocutory appeal."). That is, the distance between Tenorio and the officer at the time of the shooting would not be obvious to any reasonable officer reading the majority's opinion in *Tenorio*. *Tenorio* thus only puts police officers on notice that it is unconstitutional to shoot a knife wielder *before that knife wielder comes within striking distance*, in a situation like the one the majority described in *Tenorio*.[11] It does not speak to whether an officer may use deadly force against a knife-wielder who comes within five feet of an officer in circumstances similar to those Officer Ruiz faced.

Related to the fourth *Larsen* factor (manifest intentions of the suspect), the Tenth Circuit quoted the district court as concluding a "jury could reasonably find that the information provided to [the shooting officer] 'indicated that the only person that [Tenorio] was known to have threatened that night was himself, and that as [Tenorio] walked into the living room he did not raise the knife from his side or make threatening gestures or comments toward anyone.'" *Tenorio*, 802 F.3d at 1163. Likewise, here, a reasonable jury could conclude that, up until the time Max came out of the bathroom, he had only threatened himself. Further, it is possible that a reasonable jury, in hindsight and with the benefit of time to review Officer Ruiz's lapel video, could conclude that Max's raising his knife to his waist as he advanced and his comment that he wanted to be killed did not constitute threatening gestures or comments. But, in comparing the present case to *Tenorio*, the relevant question is not whether a reasonable jury, with the benefit of

---

[11] Nor does *Walker*—the precedent *Tenorio* relied on for clearly established law—indicate otherwise, as that case concerned an officer firing when he was twenty-one feet away from a knife-wielder who was not advancing on the officer. 451 F.3d at 1159.

20/20 hindsight, could possibly conclude that Max made no threatening gestures or comments to Officer Ruiz.

Instead, the Court must assess the situation from the perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). Thus, consideration of the situation Officer Ruiz faced must incorporate the information Officer Ruiz had about Max before the shooting. Although Officer Ruiz knew Max did not manifest any violent behavior during the time Officer Ruiz interacted with him outside, he also knew police were called to the scene because Max indicated that he was concerned his mental illness might cause him to become violent toward his parents. UMF Nos. 2 & 4. This concern was serious and credible enough that Max's parents called the police and encouraged him to go to the hospital. Indeed, Max himself initially agreed that, due to the possibility that he could become violent, police should take him to the hospital (his parents did not take him to the hospital themselves out of concern that he might become violent during transport, UMF Nos. 2 & 7). Max expressed concern, however, about what would happen to him if he became violent at the hospital. Doc. 36 at 7.

Thus, when Max came out of the bathroom holding a knife, walked toward Officer Ruiz, and pleaded with Officer Ruiz to kill him, Officer Ruiz knew that Max's mental illness might cause Max to become violent. True, in *Tenorio*, police had received information that Tenorio had been violent in the past. 802 F.3d at 1164. Information that a person has engaged in some undefined violence in the undefined past, however, is different than information that a person's own parents called 911 for police intervention based on emergent concerns that their son's

mental illness would cause him to become violent *toward them* and that they could not transport their son to the hospital themselves for fear that he would become violent *toward them* during transport.[12]

Moreover, and perhaps most significantly, as Max advanced toward Officer Ruiz holding a knife, he told Officer Ruiz that he (Max) would suffer if Officer Ruiz did not kill him and pleaded with Officer Ruiz to kill him. How far was Max willing to go to incite Officer Ruiz into shooting him? We cannot know for sure and neither could any reasonable officer in Officer Ruiz's situation. What is apparent, however, is that *Tenorio* fails to put every reasonable officer on notice that deadly force is unconstitutional when the officer is backed into a room and a mentally ill man who has expressed concerns of spontaneous violence and who just stabbed himself in the neck with a knife, approaches with the knife, begs to be shot, and gets within five feet of the officer.[13] To the contrary, it is clearly established that "[a] reasonable officer need not await the glint of steel before taking self-protective action; by then, it is often too late to take

---

[12] The person who called 911 in *Tenorio* expressed concern that Tenorio would harm Tenorio's wife, but this was not then relayed to police. 802 F.3d at 1162. Further, the Tenth Circuit quoted the district court as concluding, "for all [the officer] knew, Tenorio had threatened only himself and was not acting or speaking hostilely at the time of the shooting." The Tenth Circuit then reiterated, "As previously noted, we cannot second guess the district court's assessment of the evidence on this interlocutory appeal . . . ." *Id*. at 1165. That is, the Tenth Circuit did not consider the police officer's knowledge that Tenorio had been waving his knife around in simply accepting the district court's apparent conclusion that the police officer in *Tenorio* had no reason to believe Tenorio had threatened anyone other than himself.

[13] Even so, Plaintiffs argue, Officer Ruiz unconstitutionally used deadly force as a first resort. Doc. 36 at 30. But Plaintiffs provide no evidence that Officer Ruiz had a less lethal means of force that he could safely rely on once Max backed him into the bedroom. Indeed, in arguing Officer Ruiz recklessly created the need to use lethal force, Plaintiffs assert, "When Defendant Ruiz allowed the door to be opened, without back up or less-lethal force option . . . , he knew that Max was armed with a knife, was suicidal and unpredictable, and that there would not be an option for less than lethal force to be used on Max, such as a taser, before he would have to resort to lethal force." Doc. 36 at 30. The Court addresses Plaintiffs' reckless conduct theory later in this Opinion.

safety precautions." *Larsen*, 511 F.3d at 1260. Here, at 15:08 of the video, one second before Officer Ruiz shoots Max, the glint of steel can be seen as Max, who is well within striking distance of Officer Ruiz, raises the knife he is carrying to waist level. A reasonable officer in Officer Ruiz's situation reading *Larsen*, therefore, would not conclude that Tenth Circuit precedent has provided clear notice that the use of deadly force in such a situation would be unconstitutional. Officer Ruiz had more reason to be concerned about Max's manifest intentions than the officer in *Tenorio* had to be concerned about Tenorio's manifest intentions.

That *Tenorio* is distinguishable on its facts, however, does not end the Court's analysis. The Tenth Circuit in *Walker v. City of Orem* stated that prior Tenth Circuit precedent "established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect." 451 F.3d 1139, 1160 (10th Cir. 2006) (citing *Zuchel v. City & Cnty. of Denver*, 997 F.2d 730, 735-36 (10th Cir. 1993)).[14] The Tenth Circuit reiterated this language in *Tenorio*, 802 F.3d at 1165-66. In the present case, Officer Ruiz only had reason to believe that Max was carrying a knife; evidence drawn in Max's favor indicates he was walking toward, not charging, Officer Ruiz; and, rather than wielding his knife in a menacing manner, he raised it no higher than his waist. Thus, if the *absence* of a gun, charging, and menacing motions with a weapon

---

[14] Plaintiffs do not argue that the facts of *Walker* are sufficiently similar to those of the present case to serve as notice that Officer Ruiz's shooting was unlawful. In *Walker*, officers shot a man (Walker) who was holding a box cutter to his wrist in front of his family residence. 451 F.3d at 1157. During his encounter with police, Walker made no threats to anyone other than himself and did not advance on anyone. *Id*. at 1159, 1160. The officer who first shot Walker did so from a distance of at least 21 feet. *Id*. at 1159. The second officer who shot Walker did so from a distance of 58 feet. *Id*. at 1160. The circumstances in *Walker* are thus different from those in the present case, where Max advanced on a retreating Office Ruiz and came to within six feet of him.

necessarily means an officer uses unreasonable force *regardless of what other evidence of an immediate threat might exist*, Officer Ruiz violated Max's constitutional rights and was on notice that his actions would do so.

Reading the Tenth Circuit's absence-of-three-factors language in context, however, demonstrates that situations could arise in which deadly force is reasonable even in the absence of the three factors the Tenth Circuit identified in *Tenorio* and *Walker*. Start with the oft-cited case of *Larsen*. Citing *Walker*, the Tenth Circuit directed that, "In assessing the degree of threat facing officers" district courts should consider "whether any hostile motions were made with the weapon towards the officers." *Larsen*, 511 F.3d at 1260 (second *Larsen* factor). After citing *Walker* as authority for its list of *non-exclusive* factors, the Tenth Circuit in *Larsen* emphasized, "But in the end the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Id*. If *Walker*'s absence-of-three-factors language means all other evidence of hostility becomes irrelevant once the absence of these three factors is established, this *Walker* language comes into tension with the *Larsen* court's directive to consider the totality of the circumstances. *See Est. of George v. City of Rifle, Colo.*, 85 F.4th 1300, 1317-18 (10th Cir. 2023) ("The second *Larsen* factor asks 'whether any hostile motions were made with the weapon towards the officers.' The undisputed evidence in this case establishes that George never pointed his handgun at either officer or anyone besides himself. Thus, viewed in isolation, this factor would weigh in favor of the plaintiffs. But, as we have noted, the *Larsen* factors are 'non-exclusive' and we must always consider 'the totality of the circumstances.' Despite the fact that George never pointed his handgun at anyone besides himself, it is undisputed that George ignored numerous verbal orders from both Ryan and McNeal to drop his weapon." (quoting *Larsen*, 511 F.3d at 1260)).

Thus, this absence-of-three-factors quote from *Walker* is not always the end of the story. The Court does not interpret *Tenorio* and *Walker* as holding that where a suspect is carrying only a knife, not charging, and not holding the knife in a threatening manner, deadly force is per se unreasonable, *regardless of whatever other facts might exist*. A suspect can manifest hostility in other ways than "charging" and "making slicing or stabbing motions." Suppose, for instance, the knife-wielder, although holding the knife at his side, had arms flexed, looked extremely agitated, and was simultaneously yelling in profane language that he intended to plunge his knife into the officer's heart. *Walker* says nothing about distance. Must an officer allow this hypothetical knife-wielder to walk within a foot of the officer where he could easily strike a deadly blow? An obvious response to this answer is that, rather than letting the knife-wielder walk to within a foot of the officer, the officer should retreat. But what if, like here, the officer is backed into a place where he can retreat no further? Does the officer then have to choose between shooting an assailant (and thereby, as a matter of law, violating his constitutional rights) or the likelihood of having a knife plunged into his heart? The Court does not read *Tenorio* and *Walker* as forcing this Hobson's choice on an officer in such a situation.[15] *See Lennen v. City of Casper, Wyo.*, No. 21-8040, 2022 WL 612799, at *8 (10th Cir. Mar. 2, 2022) (sword-yielding man's "disregard of the Officers' commands further demonstrated his hostile intent").

Nor have other courts. Since the Tenth Circuit quoted this published language in *Walker*, numerous district courts have granted qualified immunity in situations where a police officer shot a knife-wielder who was not charging the police officer or anyone else and who was not waving the knife in a menacing manner. *See, e.g., Jackson v. City of Wichita, Kan.*, No. 13cv1376, 2017 WL 106838, at *8 (D. Kan. Jan. 11, 2017) (finding violation of constitutional

---

[15] Whether Officer Ruiz recklessly placed himself in such a situation is addressed below.

rights but no clearly established law); *Est. of Castaway by & through Castaway v. Traudt*, No. 16cv1763, 2019 WL 6700512, at *8 (D. Colo. Dec. 9, 2019) (finding no constitutional violation); *Baca v. Cosper*, No. 22cv552, 2023 WL 5725427, at *3 (D.N.M. Sept. 5, 2023) (finding deadly force to be reasonable).

Further, no Supreme Court precedent exists to establish that deadly force is per se unreasonable when a knife-wielder neither charges anyone nor holds the knife in a menacing manner. Consider *Kisela v. Hughes*, 584 U.S. 100 (2018), a decision the Supreme Court issued three years after the Tenth Circuit decided *Tenorio*. In *Kisela*, police responded to a 911 call that a woman was hacking a tree with a kitchen knife and acting erratically. *Id.* at 101. When police arrived, they saw a woman (Sharon Chadwick) standing next to a car in the driveway of a house. *Id*. Another woman (Amy Hughes) then came out of the house carrying a large kitchen knife at her side. *Id*. Hughes, who matched the description of the woman hacking at the tree, walked toward Chadwick and stopped 6 feet from her. *Id*. Although the officers themselves were not in immediate danger because a chain-link fence separated them from Chadwick, all three officers drew their guns. *Id*. at 101-02. At least twice they told Hughes to drop the knife. *Id*. at 101. Chadwick told both Hughes and the officers to "take it easy." *Id*. "Hughes appeared calm, but she did not acknowledge the officers' presence or drop the knife." *Id*. at 101-02. One of the officers then shot Hughes four times. *Id*. at 102. Bypassing the first prong of a qualified immunity analysis, the majority of the Supreme Court concluded at the second prong of the analysis, "This is far from an obvious case in which any competent officer would have known that shooting Hughes to protect Chadwick would violate the Fourth Amendment." *Id*. at 105-06.

*Kisela* has many similarities to the present case. Both cases involved a person carrying a knife at their side. In both cases, the knife-holder appeared calm. In both cases, officers

suspected the knife-wielder of no crime and gave no explicit warning that they were about to open fire. In both cases, officers had information that they likely were going to be dealing with a mentally disturbed individual who might act erratically. Because *Kisela* did not address the first prong of qualified immunity, however, it provides little guidance as to whether Officer Ruiz's use of deadly force was unconstitutional. Similarly, because *Kisela* involved an appeal from the Ninth Circuit, the Supreme Court had no occasion to analyze whether Tenth Circuit precedent existed that would have put the officer on notice that his conduct was unconstitutional. Nonetheless, *Kisela* does establish that no Supreme Court case exists to put officers on notice that deadly force can never be used on a knife-wielder who does not wave the knife in a menacing manner or charge anyone.

Thus, for the reasons articulated above, the Court concludes that no Tenth Circuit or Supreme Court cases existed to put Officer Ruiz on notice that his use of deadly force was unconstitutional as claimed in Count II of Plaintiffs' complaint.

## II.    Count I: Recklessness

In Count I of the operative complaint, Plaintiffs allege that Officer Ruiz's conduct leading up to the shooting recklessly created the need for him to use force against Max. Doc. 1-2 at 19-22. This reckless conduct began, Plaintiffs argue, when Officer Ruiz declined to take Max to the hospital against Max's wishes. Then, Plaintiffs assert, Officer Ruiz made the reckless decision to go into Max's house without backup or a nonlethal option; ignored his training and department policy about how to deal with an armed, barricaded, and suicidal individual; created a lethal confrontation when he allowed Wanda to open the bathroom door; created such a confrontation even though he knew Max was armed with a knife, suicidal, unpredictable, and could become violent; and then, when Max came out of the bathroom with a knife, backed

himself into a bedroom with no means of escape and no option available other than the use of lethal force. Doc. 36 at 30.

In addressing Officer Ruiz's responsive assertion of qualified immunity, the Court takes the same path the Supreme Court in recent years has taken in in *Bond*, *Kisela*, and *Sheehan*: it will skip the first prong of a qualified immunity analysis and proceed directly to the second prong. *See Bond*, 595 U.S. at 12 (regardless of whether "the officers violated the Fourth Amendment in the first place, or whether recklessly creating a situation that requires deadly force can itself violate the Fourth Amendment," the officers are entitled to qualified immunity if they "plainly did not violate any clearly established law"); *Kisela*, 584 U.S. at 103-04 ("Here, the Court need not, and does not, decide whether Kisela violated the Fourth Amendment when he used deadly force against Hughes. For even assuming a Fourth Amendment violation occurred— a proposition that is not at all evident—on these facts Kisela was at least entitled to qualified immunity."); *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015) (noting that, although it could decide whether the officers' conduct was unconstitutional, "we simply decide whether the officers' failure to accommodate Sheehan's illness violated clearly established law. It did not."). Looking at the second prong, the Court concludes that Plaintiffs have failed to cite clearly established law that would have put Officer Ruiz on notice that his conduct would violate Max's constitutional rights.

In support of their argument that Officer Ruiz's allegedly reckless conduct violated the constitution by creating the need to use deadly force, Plaintiffs rely primarily on two cases they assert provided Officer Ruiz with clear notice that his use of deadly force was unlawful: *Allen v. Muskogee, Oklahoma*, 119 F.3d 837 (10th Cir. 1997), and *Estate of Ceballos v. Husk*, 919 F.3d

1204, 1218 (10th Cir. 2019). *See* Doc. 36 at 28, 39-42.[16] The Court thus compares the facts in

these cases to the facts in the present case to determine whether they are similar enough to

provide all reasonable officers clear notice that Officer Ruiz's conduct was unlawful. The Court

also considers the Tenth Circuit and Supreme Court's analysis of these cases in *Bond v. City of

Tahlequah*, 981 F.3d 808 (10th Cir. 2020), and on appeal in *City of Tahlequah, Oklahoma v.

Bond*, 595 U.S. 9, 13 (2021).

In *Allen*, police officer Lt. Donald Smith learned that Terry Allen had left his home, was

armed with several guns, had threatened family members, had an outstanding warrant for

impersonating a police officer, and was reported to be at his sister's house threatening suicide.

119 F.3d at 839. Lt. Smith proceeded to the house, where he found Allen sitting in the driver's

seat with one foot out of his vehicle. *Id.* He had a gun in his right hand, which was resting on the

console between the seats. *Id.* According to some deposition testimony, Lt. Smith ran screaming

up to Allen's car and immediately began shouting at Allen to get out of his car and drop the gun.

*Id.* at 839, 841. Within the next ninety seconds after Lt. Smith's arrival:

---

[16] To a lesser degree, Plaintiffs also rely on *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995). Doc. 36 at 25. The Supreme Court, however, has indicated that because the Tenth Circuit concluded in *Sevier* that it did not have jurisdiction, *Sevier*'s analysis of reckless conduct that created a need to use excessive force constitutes dicta that cannot establish controlling authority. *City of Tahlequah, Okla. v. Bond*, 595 U.S. 9, 13 (2021) ("As for *Sevier*, that decision merely noted in dicta that deliberate or reckless preseizure conduct can render a later use of force excessive before dismissing the appeal for lack of jurisdiction. To state the obvious, a decision where the court did not even have jurisdiction cannot clearly establish substantive constitutional law." (citation omitted)); *see also Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 761 n.9 (10th Cir. 2021) (recognizing that *Bond* does not allow *Sevier* to set clearly established law regarding the reckless creation of a need to use deadly force but finding that, "since *Sevier*, the 'reckless or deliberate conduct' inquiry has become a standard feature of our excessive-force analysis." Thus, despite *Bond*'s analysis of *Sevier*, the *Taylor* court did "not feel obliged . . . to revisit our well-settled precedent that incorporates a 'reckless or deliberate conduct' dimension into the excessive force analysis."). Accordingly, although the Court recognizes that an officer in the Tenth Circuit can violate the constitution by recklessly or deliberately creating the need to use excessive force, it does not analyze the facts of *Sevier*, as that particular case cannot set clearly established law.

> Officer Bentley McDonald arrived and joined Lt. Smith at the driver's side door.
> Lt. Smith then reached into the vehicle and attempted to seize Mr. Allen's gun,
> while Officer Bentley held Mr. Allen's left arm. Officer Bryan Farmer, who
> arrived with Officer Bentley, approached Mr. Allen's car from the passenger side,
> and attempted to open a passenger side door. Mr. Allen reacted by pointing the
> gun toward Officer Farmer, who ducked and moved behind the car. Mr. Allen
> then swung the gun toward Lt. Smith and Officer McDonald, and shots were
> exchanged. Lt. Smith and Officer McDonald fired a total of twelve rounds into
> the vehicle, striking Mr. Allen four times.

*Id.* at 839. The Tenth Circuit, after discussing these facts, held that "a reasonable jury could

conclude on the basis of some of the testimony presented that the officers' actions were reckless

and precipitated the need to use deadly force." *Id.* at 841.

In *Estate of Ceballos*, Jaime Ceballos's wife called police to report that Ceballos was in

their driveway with a baseball bat "acting crazy," and that he was drunk and probably on drugs.

919 F.3d at 1208-09. Defendant William Husk and several other police officers responded. *Id.* at

1209. Officers Husk and Ward approached Ceballos. *Id.* at 1210. When they were approximately

100 yards from the residence, they saw Ceballos pacing in the driveway, swinging a baseball bat,

yelling and throwing his arms in the air. *Id.* There was no one else in the driveway with Ceballos.

*Id.* As the district court described it:

> Officers Husk and Ward walked in the middle of the street toward Ceballos to
> keep a clear line of sight. They both repeatedly shouted commands for Ceballos to
> drop the bat. Instead of doing so, he went into his garage. Either before or after
> Ceballos went into the garage, Officer Husk drew his firearm and Officer Ward
> drew his less lethal taser. Ceballos emerged from the garage with the bat in his
> hand and began walking toward the officers, who had their weapons drawn and
> continued shouting commands. The evidence is conflicting as to whether Ceballos
> was walking quickly or slowly toward the officers and whether Officers Husk and
> Ward continued to advance toward Ceballos or stopped their approach to give him
> an opportunity to comply with their commands. It is undisputed that he did not
> comply with their commands . . . . [A] jury could infer that Officer Husk fired his
> gun at virtually the same time that Officer Ward deployed his taser, if not sooner.

*Id.* as 1210-11. Officer Husk shot Ceballos within a minute of his arrival on the scene. *Id.* at

1209.

The Tenth Circuit found that, viewing the facts most favorable to the plaintiff, Officer

Husk had violated the law as clearly established in *Allen* by recklessly creating the need to use

force. "Officer Husk shot and killed an emotionally distraught Ceballos within a minute of

arriving on scene. Under the Estate's version of the facts—which Husk accepts as true for

purposes of this appeal—Husk approached Ceballos quickly, screaming at Ceballos to drop the

bat and refusing to give ground as Ceballos approached the officers." *Id.* at 1216. The Tenth

Circuit found it significant that the officers knew that Ceballos's "capacity to reason was

diminished, whatever the underlying reason might have been." *Id.* at 1217. The Tenth Circuit

also emphasized that "Ceballos did not retreat into his garage and then become aggressive

toward the officers until Officers Husk and Ward approached him directly, both yelling

commands at him." *Id.* (emphasis removed).

More recently, in *Bond v. City of Tahlequah*, 981 F.3d 808 (10th Cir. 2020), en route to

reversing a district court's decision to grant qualified immunity to officers who shot a man after

that man threatened them with a hammer, the Tenth Circuit considered *Allen* and *Ceballos*. The

situation in *Bond* started when a woman called the police, explaining that her ex-husband was

intoxicated and would not leave her garage. *City of Tahlequah, Okla. v. Bond*, 595 U.S. 9, 10

(2021).[17] When officers arrived, they went to the side entrance of the garage and began speaking

with the ex-husband in the doorway. *Id.* After the ex-husband refused a pat down, one officer

stepped toward the ex-husband, causing the ex-husband to take one step back. *Id.* The ex-

husband then turned around and walked to the back of the garage, with the officers following

behind. *Id.* The ex-husband grabbed a hammer from the back wall and turned around to face the

---

[17] For the underlying facts, the Court cites to the Supreme Court's decision in *Bond* as the higher
authority, rather than the Tenth Circuit's decision.

officers. *Id.* at 11. No officer was within six feet of the ex-husband. *Id.* The ex-husband grasped

the hammer with both hands, as if preparing to swing, and pulled the hammer to shoulder level.

*Id.* The officers backed up, drawing their guns, and yelled to drop the hammer. *Id.* The ex-

husband did not comply, but instead took a few steps to his right, coming out from behind a

piece of furniture to gain an unobstructed path to one officer. *Id.* He raised the hammer higher

and took a stance as if to throw it; in response, two officers fired, killing him. *Id.*

The Supreme Court then granted *certiorari* and, in a unanimous five-page per curium

decision, reversed the Tenth Circuit's decision to deny qualified immunity to the police officer.

*Id.* at 12. Like *Kisela*, the Supreme Court in *Bond* skipped to the second prong of a qualified

immunity analysis and so did not address whether the use of deadly force was constitutional.

Thus, *Bond* provides little guidance regarding that inquiry. *Bond*, however, does provide

guidance as to the following question: looking at Tenth Circuit and Supreme Court precedent,

what notice was clearly provided to police officers in 2016, when the shooting at issue in *Bond*

occurred?

In reversing the Tenth Circuit, the Supreme Court stated:

We have repeatedly told courts not to define clearly established law at too high a
level of generality. *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). It is
not enough that a rule be suggested by then-existing precedent; the "rule's
contours must be so well defined that it is 'clear to a reasonable officer that his
conduct was unlawful in the situation he confronted.'" *D.C. v. Wesby*, 583 U.S.
48, 63 (2018) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Such
specificity is "especially important in the Fourth Amendment context," where it is
"sometimes difficult for an officer to determine how the relevant legal doctrine,
here excessive force, will apply to the factual situation the officer confronts."
*Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (internal quotation marks
omitted).

*Bond*, 595 U.S. at 12 (citation styles altered). The Supreme Court then explained:

Not one of the decisions relied upon by the Court of Appeals . . . comes close to
establishing that the officers' conduct was unlawful. The Court relied most
heavily on *Allen*. But the facts of *Allen* are dramatically different from the facts

32

here. The officers in *Allen* responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect, and attempting to physically wrest a gun from his hands. 119 F.3d at 841. Officers Girdner and Vick, by contrast, engaged in a conversation with Rollice, followed him into a garage at a distance of 6 to 10 feet, and did not yell until after he picked up a hammer. We cannot conclude that *Allen* "clearly established" that their conduct was reckless or that their ultimate use of force was unlawful.

*Id.*

The facts in the present case are much more similar to those in *Bond* than to those in *Allen*. Just as *Allen* did not "come close" to clearly establishing that the conduct in *Bond* was unconstitutional under a reckless conduct theory, *Allen* does not establish that the conduct in the present case was unconstitutional under such a theory. Like the officer in *Bond*, and unlike the officer in *Allen*, Officer Ruiz's initial interactions with Max were calm and unconfrontational. Officer Ruiz explained to Max that they were there to help him, that he was not under arrest, and no one was forcing him to go to the hospital. Although he did advise Max that they would have to handcuff Max during transport to the hospital, per his department's policy,[18] when Max agreed to be handcuffed and then changed his mind, Officer Ruiz calmly took off the one handcuff that he had placed on Max. UMF Nos. 13-14. When Max asked to be handcuffed with his hands in front of him instead of behind him, Officer Ruiz agreed to do so. UMF No. 17. And when Max

---

[18] Plaintiffs argue that department policy left "wiggle room" under which Officer Ruiz did not have to handcuff Max. The Court need not resolve the parties' dispute regarding whether department policy permitted Officer Ruiz to transport Max without Max being handcuffed. Michael had already explained to Officer Ruiz that he and Wanda did not want to transport Max to the hospital themselves, as they had done in the past, because both they and Max were concerned that Max would become violent toward them during transport. UMF Nos. 2, 7 & 8. Max also told Officer Ruiz that he was concerned about becoming violent at the hospital. Doc. 36 at 7. Given information that Max's mental illness might cause him to erupt into uncontrolled violence, even if Officer Ruiz had "wiggle room" not to handcuff Max during transport, Plaintiffs provide no controlling authority in support of the unpersuasive argument that Officer Ruiz violated Max's constitutional rights in exercising his discretion not to take advantage of this "wiggle room." Indeed, Plaintiffs also argue that Max presented a threat so great that Officer Ruiz should have involuntarily transported Max to the hospital. Doc. 36 at 7-8.

then told Officer Ruiz that he changed his mind about going to the hospital and asked Officer

Ruiz to take the handcuffs off, Officer Ruiz calmly did so. UMF Nos. 21-22. When Max

indicated he needed time to think, Officer Ruiz allowed him to step away to think through the

situation. UMF No. 24. This calm and accommodating interaction is a far cry from the

interaction in *Allen*, where officers responded to a suicide call by immediately sprinting toward a

parked car, screaming at the suspect, and attempting to physically wrest a gun from the suspect's

hands.

     Now compare the facts of the present case to those in *Bond*. The suspect in *Bond* never

came within six feet of the officers. In contrast, Max repeatedly asked a retreating Officer Ruiz

to kill him and came within four to five feet of Officer Ruiz before he was shot. Granted, unlike

the ex-husband in *Bond* who held a hammer like a baseball bat and raised it as if he was going to

throw it, Max raised his knife no higher than his waist and made no stabbing or slashing motions.

Nonetheless, given the similarities between this case and *Bond*, and that the distance between

Officer Ruiz and Max was much closer than the distance between police officers and the man

shot in *Bond*, it would be difficult to conclude that, although officers in the Tenth Circuit did not

have notice that the conduct in *Bond* was unconstitutional, they nonetheless had notice that the

conduct in this case was unconstitutional. Just as the Supreme Court found that *Allen* did not

provide notice to the officers in *Bond*, the Court here finds that *Allen* did not provide notice to

Officer Ruiz that his conduct would be illegal.

     The Court thus turns to the next case Plaintiffs rely on: *Ceballos*. Unlike *Allen*, the

Supreme Court in *Bond* did not consider the underlying facts of *Ceballos*. This is because the

Tenth Circuit decided *Ceballos* in 2019, after the time of the encounter in *Bond*. *See Bond*, 595

U.S. at 13 ("*Estate of Ceballos*, decided after the shooting at issue, is of no use in the clearly

established inquiry."). In contrast to the situation in *Bond* where the Supreme Court had no reason to analyze *Ceballos*, because the Tenth Circuit decided *Ceballos* the year before Officer Ruiz shot Max, it provides clearly established law relevant to the present case.

*Ceballos*, however, is different from the present case for the same reasons as *Allen* and so advances Plaintiffs' case no farther than does *Allen*. In *Ceballos*, "Officer Husk shot and killed an emotionally distraught Ceballos within a minute of arriving on scene." 919 F.3d at 1216. And, Ceballos did not become aggressive toward officers until after they approached him directly, yelling commands at him. *Id*. at 1217. Conversely, Officer Ruiz calmly interacted with Max for fifteen minutes after he arrived. Further unlike the situation in *Ceballos* and *Allen*, where police could have kept their distance from a suicidal suspect, Officer Ruiz was summoned into Max's house by cries of "Help! Help!" from Max's mother. Outside the bathroom, Officer Ruiz was then confronted with a difficult situation: Max, unpredictable, mentally disturbed, and potentially violent, had repeatedly stabbed himself in the neck, was not responding to Officer Ruiz's calls, and was out of sight behind a closed door. This is different than the situation in *Ceballos* and *Allen*, where the mentally disturbed individuals the police had been called to check on could be seen and had not inflicted any harm on themselves or others. *See Flores v. Henderson*, 101 F.4th 1185, 1198 (10th Cir. 2024) (noting a "key" difference between officer shooting man who came out of bedroom with a machete and shooting in *Allen* was the inability to "see the decedent, his weapon, and . . . evaluate exactly what type of threat he posed"). Officer Ruiz's inability to see Max, the potential serious injury Max had inflicted on himself, and the desire of Max's mother to open the bathroom door to check on her son, distinguishes the present situation from *Ceballos* to such a degree that *Ceballos* could not put Officer Ruiz on notice that his conduct would be unlawful.

Moreover, a reasonable officer in Officer Ruiz's situation reading *Ceballos* could find that *Ceballos*'s analysis of another Tenth Circuit case—*Clark v. Colbert*, 895 F.3d 1258 (10th Cir. 2018)—supports the use of deadly force in the present case. To emphasize the importance of considering *how* police approach an individual with diminished capacity to reason, *Ceballos* compared the yelling, aggressive, approach of the officers in *Ceballos* to the non-aggressive approach of officers in *Clark*. The officers there initially withdrew from the plaintiff, called for backup, waited for additional officers to arrive, and then developed a strategy to arrest the plaintiff. *Clark*, 919 F.3d at 1220. And, although the officers eventually shot the plaintiff with deadly ammunition, they first tried using non-lethal force: shooting him with beanbags and tasing him. *Id*. These facts distinguished *Clark* from *Allen*. As the *Clark* court stated, unlike *Allen* where a plaintiff could "prove police ran—weapons drawn and screaming—up to an armed, suicidal suspect," the officers in *Clark* did not engage in reckless conduct that forced a deadly confrontation. 895 F.3d at 1264.

Although Plaintiffs do not cite *Clark*, they do argue that Officer Ruiz "was trained that suicidal barricaded subjects, like Max, should not be engaged and that APD training required him to get Max's parents out of the house and call and wait for back-up to arrive before attempting to make contact with Max." Doc. 36 at 29. While outside dealing with a calm Max, however, Officer Ruiz would have had no reason to take the same actions upon arrival as the officers in *Clark*, who arrived to find a mentally disturbed man holding a long kitchen knife, refusing to submit to arrest, and making obscene and threatening gestures toward the officers. *Id*. at 1263. This, then, brings us to how circumstances changed, and Max came to resemble more closely the plaintiff in *Clark*.

After Max and Wanda went into the house, Wanda yelled "Help! Help! [indistinguishable] Help!" Def's Ex. D at 14:04-14:08. Officer Ruiz entered the house where Michael directed him, with Michael following him inside. *Id.* at 14:26-14:30. Officer Ruiz glanced into the bedrooms, turned around, and asked Michael: "Where? Here?" *Id.* at 14:39-14:43. Michael responded "Yeah" and pointed to a closed bathroom door. *Id.* at 14:43. Officer Ruiz knocked on the door and called out "Max," but no one responded. *Id.* at 14:44-14:48. Wanda came around the corner into the hallway as Officer Ruiz called out "Max" once again. *Id.* at 14:51-14:52. Wanda went to unlock the door, and Officer Ruiz told her, "No, no. Let him open it." *Id.* at 14:53-14:55. Wanda obeyed this command and stopped trying to open the door. Officer Ruiz asked her: "Did you see anything?" Wanda responded: "Yeah, he has a knife in his hand and he's stabbing at his neck." *Id.* at 14:56-15:01. As she said this, Wanda demonstrated by feigning repeated and violent stabs to the side of her neck. *Id.*

At various points in the timeline in the above paragraph, Plaintiffs argue, Officer Ruiz should have taken a different course—that is, Plaintiffs argue allowing Wanda to open the door recklessly forced a confrontation with an armed, suicidal, and mentally ill man. Doc. 36 at 30. Plaintiffs contend that, rather than engage in a confrontation where he might have no choice but to use lethal force, Officer Ruiz should have withdrawn to develop a better plan. *Id.* at 29-30. Plaintiffs further suggest that, having chosen not to withdraw from the hallway and to let Wanda open the bathroom door, Officer Ruiz then chose his retreat poorly, backing up into a small bedroom instead of down the hall the way he came in. Doc. 36 at 33-34. In support of their contentions, Plaintiffs rely on expert reports that reference police policies and Officer Ruiz's training.

37

The Supreme Court and Tenth Circuit, however, have been hesitant to embrace expert opinions that invite a district court to second guess the decisions of an officer on the scene. Consider *Sheehan*. There, police were called to a group home for people dealing with mental illness to conduct a welfare check on one of the residents. 575 U.S. at 603. When a social worker opened the door to Teresa Sheehan's room, she yelled at the social worker to get out and told him that she had a knife and would kill him if she had to. *Id*. The social worker left the room and Sheehan slammed her door shut. *Id*. The social worker took measures to clear the building of other people and completed an application to have the woman detained for an evaluation. *Id*. The social worker also confirmed that a local hospital would see Sheehan. *Id*. at 604. When two police officers (Sergeant Reynolds and Officer Holder) arrived, the social worker and the police officers knocked on Sheehan's door and told her that they wanted to help her. *Id*. When she did not answer, the social worker used his key to open Sheehan's door. *Id*. Sheehan reacted violently, grabbing a knife, approaching the officers and yelling that she would kill them. *Id*. The officers left the room and Sheehan once again closed the door. *Id*. The officers were concerned about what Sheehan might do behind the closed door—for instance, she might gather more weapons or escape out the window and then endanger others. *Id*.

As the Supreme Court noted, "Reynolds and Holder had to make a decision. They could wait for backup—indeed, they already heard sirens. Or they could quickly reenter the room and try to subdue Sheehan before more time elapsed. Because Reynolds believed that the situation 'required [their] immediate attention,' the officers chose reentry." *Id*. at 605 (citation omitted). When the officers went back into the room, one of them pepper sprayed Sheehan in the face. *Id*. But this did not cause Sheehan to drop her knife. *Id*. When she was only a few feet away from the officers, one of them shot her twice. *Id*.

Sheehan sued the officers under section 1983. "In support of her claims, she offered testimony from a former deputy police chief, Lou Reiter, who contended that [the individual police officers] fell short of their training by not using practices designed to minimize the risk of violence when dealing with the mentally ill." *Id*. at 606. Although the Ninth Circuit concluded that the officers reasonably used force once the pepper spray failed to stop Sheehan's advance, it also held that a jury could find that the officers "provoked" Sheehan by needlessly forcing the second confrontation. *Id*. at 607.[19] Further, it held that "it was clearly established that an officer cannot forcibly enter the home of an armed, mentally ill subject who had been acting irrationally and had threatened anyone who entered when there was no objective need for immediate entry." *Id*. (internal quotation marks omitted).

In reversing the Ninth Circuit's denial of qualified immunity, the Supreme Court wrote, "even if Reynolds and Holder misjudged the situation, Sheehan cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *Id*. at 615 (internal quotation marks omitted). Moreover, the Supreme Court stated:

> Nor does it matter for purposes of qualified immunity that Sheehan's expert, Reiter, testified that the officers did not follow their training. . . . Even if an officer acts contrary to her training, however, (and here, given the generality of that training, it is not at all clear that Reynolds and Holder did so), that does not

---

[19] Two years later, the Supreme Court held that "the Fourth Amendment provides no basis for" the Ninth Circuit's provocation rule. *City of Los Angeles v. Mendez*, 581 U.S. 420, 423 (2017). Under the provocation rule, the Ninth Circuit had held that an officer who used reasonable force could nonetheless be held liable for injuries caused by the seizure if the officer committed a separate Fourth Amendment violation that contributed to the need to use force. *Id*. This rule, predicated on an initial constitutional violation separate from excessive force, is different than the rule in the Tenth Circuit that an officer's use of deadly force can be excessive and therefore unlawful if the officer recklessly or deliberately created the need to use that deadly force. Since *Mendez*, the Tenth Circuit has reaffirmed its recognition of this latter doctrine. *See Est. of Taylor*, 16 F.4th at 761 ("the 'reckless or deliberate conduct' inquiry has become a standard feature of our excessive-force analysis"); *Flores v. Henderson*, 101 F.4th 1185, 1194 (10th Cir. 2024).

> itself negate qualified immunity where it would otherwise be warranted. Rather,
> so long as a reasonable officer could have believed that his conduct was justified,
> a plaintiff cannot avoid summary judgment by simply producing an expert's
> report that an officer's conduct leading up to a deadly confrontation was
> imprudent, inappropriate, or even reckless.

*Id*. at 616 (internal quotation marks omitted). The Supreme Court in *Sheehan* also cited with

approval the following previous statement from a Justice Ginsburg concurring opinion: "[I]n

close cases, a jury does not automatically get to second-guess these life and death decisions, even

though a plaintiff has an expert and a plausible claim that the situation could better have been

handled differently." *Id*. at 617 (quoting *Saucier v. Katz,* 533 U.S. 194, 216 (2001) (Ginsburg, J.,

concurring)). Thus, under Supreme Court precedent, the relevant inquiry is not whether a

reasonable jury could accept an expert's report and conclude that an officer's conduct was

reckless. Instead, the relevant inquiry is whether a reasonable officer could have believed that his

conduct was justified.

The Tenth Circuit has applied the same rationale to eschew expert reports submitted to

establish recklessness and defeat qualified immunity. In *Thomson v. Salt Lake County*, the

plaintiffs argued that the release of a police dog constituted excessive force and that Salt Lake

County failed to adequately train its officers regarding their treatment of people believed to be

suicidal. 584 F.3d 1304, 1311 (10th Cir. 2009). The plaintiffs' expert opined that "using the dog

to attack and bite was tactically inadvisable and in contravention of principles of officer safety

because it increased the risk of injury to the officers and to Mr. Thomson." *Id*. at 1321. Such

expert testimony, however, was insufficient to defeat the police officer's assertion of qualified

immunity. The Tenth Circuit reasoned:

> Despite Plaintiffs' assertion, however, "[w]e evaluate the officer's reasonableness
> from the on-scene perspective, not with the advantage of 20/20 hindsight." *Jiron*,
> 392 F.3d at 418. We cannot now consider whether other actions would have been
> more appropriate or, indeed, optimal. Instead, we consider whether it was
> reasonable to release a police dog to locate an armed suspect in a residential

neighborhood; the facts suggest that Deputy Morrical "adequately performed his duties as a reasonable law enforcement officer by taking steps to prevent an armed and agitated suspect from escaping." *Id.* As explained above, the totality of the circumstances made the decision reasonable at the time, even if an outside observer might now find it "inadvisable."

*Id.*

Although experts can provide valuable information about what options an officer had available in a situation and what training officers receive (to the extent such training bears on whether a reasonable officer in the situation could perceive a particular course of action to be reasonable), expert testimony cannot provide a permissible pathway to the second-guessing or 20/20 hindsight review the Supreme Court and Tenth Circuit have repeatedly said is impermissible. *Tenorio v. Pitzer*, No. 20cv1295, 2019 WL 687853, at *6 (D.N.M. Feb. 19, 2019) ("Evidence of the violation of a standard operating procedure . . . is generally inadmissible to prove a Section 1983 excessive force claim because of the minimal probative value of the evidence balanced against the likelihood the jury could confuse legal and administrative standards."). The second-guessing of an officer's split-second decisions, without considering the situation from the perspective of a reasonable officer on the scene, has no place in a qualified immunity analysis. *See Larsen*, 511 F.3d at 1259 (the "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (internal quotation marks omitted)). "Moreover, because 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective.'" *Id*. at 1259-60 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). Accordingly, rather than simply deferring to the testimony of Plaintiffs' experts, the Court must "evaluate the office's reasonableness from the on-scene perspective, not with the

advantage of 20/20 hindsight." *Jiron v. City of Lakewood*, 392 F.3d 410, 418 (10th Cir. 2004);

*Flores v. Henderson*, 101 F.4th 1185, 1196 (10th Cir. 2024).

Even so, Plaintiffs argue, in this case Officer Ruiz did not have to make a split-second

decision. Doc. 36 at 29. It is true that, while in the bathroom with the door locked, Max appeared

to present only a threat to himself. Officer Ruiz could have cleared the house and left Max alone

in the bathroom. Max's mother, however, already had tried to open the door to check on her son.

As Officer Ruiz points out, it is not clear that Officer Ruiz had the legal authority to prevent a

mother from opening a door in her own house to check on the welfare of her son, who she had

just seen repeatedly stab himself in the neck—especially when, up to that point, her son had not

threatened anyone else. Doc. 44 at 9. If Officer Ruiz prevented Wanda from opening the door to

check on her son, or even persuaded her not to do so, might this result in Max bleeding to death

on his parents' bathroom floor? A reasonable officer in Officer Ruiz's position could not know.

And, although clearing the house and leaving Max in the bathroom would have given Officer

Ruiz time to decide what to do next, this might have been time that Max, if he was bleeding to

death on the bathroom floor, did not have.[20]

Contrary to Plaintiffs' argument, at the moment Wanda started to unlock and open her

bathroom door, Officer Ruiz did not enjoy the luxury of abundant time to contemplate his next

course of action. The situation was unlike the one in *Clark*, where the plaintiff did not appear

injured and was not actively trying to kill himself. It was unlike the one in *Ceballos* where the

Tenth Circuit determined police should have backed off and let Ceballos rant rather than

confront him and back him into a garage. And it was unlike the situation in *Allen* where a

---

[20] Officer Ruiz had already shouted out to Max behind the closed door and received no answer. Def's Ex. D at 14:44-14:52.

suicidal man had a gun, but was sitting in his car where he could be seen and had not yet injured himself. Rather, Officer Ruiz found himself in a stressful situation in which, not knowing whether Max was bleeding to death on the bathroom floor, he had to make a quick judgment call. He told Wanda "Okay" and Wanda opened the door. Doc. 36 at 10. Even considering Plaintiffs' proffered expert testimony and department policy,[21] such evidence does not support the notion that any reasonable officer would understand that the only reasonable course of action here was to prevent a mother from checking on the son she just saw stabbing himself in the neck and then to abandon the scene, as opposed to determining if Max was lying on the bathroom floor bleeding to death.

Further, the general department policies Plaintiffs cite do not address the specific situation in which Officer Ruiz found himself. Nothing in any policy Plaintiffs have presented addresses what to do when an officer has information that a man has possibly inflicted a life-threatening injury on himself, has locked himself in a room where he cannot be seen, is unresponsive, and has his mother, in her own house, trying to open the door to render assistance. Nor do any cases Plaintiffs cite, or about which the Court is aware, present similar facts.

Both *Allen* and *Ceballos* establish that reckless conduct can consist of an aggressive and loud approach to confront a suspect, especially when that suspect is mentally unstable. *Arnold v. City of Olathe, Kan.*, 35 F.4th 778, 789 (10th Cir. 2022) ("our cases suggest that recklessness is manifested mostly by police onslaught at the victim" (internal quotation marks omitted)). But at no time before Max locked himself in the bathroom did Officer Ruiz rush to confront Max or otherwise act aggressively. He did not cause Max to go into the house, stab himself, and lock

---

[21] Officer Ruiz argues Plaintiffs' expert testimony is unreliable and inadmissible. *E.g.*, Doc. 44 at 4. The Court need not resolve this debate because, even if the testimony otherwise passed muster, it would not alter the outcome of the Court qualified immunity analysis.

himself in the bathroom. He only entered the house in response to Wanda's cries for help. Nor did Officer Ruiz open the bathroom door himself or direct Wanda to open the bathroom door. True, neither did he prevent Wanda from opening the door. But no case exists to put Officer Ruiz on notice that not preventing Wanda from opening a bathroom door in her own house to check on her stabbed son was so reckless that any reasonable officer would understand that any subsequent use of deadly force, even if necessary to protect the officer's life, would be unlawful. Here, when Wanda opened the bathroom door, it was Max who immediately began to walk toward Officer Ruiz (with a knife), not the other way around (as in *Allen* and *Ceballos*).

Neither *Allen* nor *Ceballos* clearly establish that it is a violation of the Fourth Amendment for an officer to answer a person's call for help inside a home, choose not to prevent that person from opening a door inside her own home, and then retreat as far as the officer believes he can safely manage before engaging in deadly force. Unlike the officers in *Allen* and *Ceballos*, Officer Ruiz calmly interacted with a mentally disturbed individual for fifteen minutes after arriving on the scene. He entered the home only in response to an urgent call for help. In entering the home, he did not sprint to confront a visible knife wielder, but only chose not to prevent a homeowner from opening her bathroom door. And then he immediately began retreating when he saw that the victim had a knife and was advancing on him. No reasonable officer would be placed on notice from *Allen* or *Ceballos* that these actions were so reckless that it would be unconstitutional to shoot the knife-wielder once the knife-wielder got within five feet of the officer and the officer could retreat no more.

The Tenth Circuit's most recently published decision that addresses an excessive force claim predicated on underlying recklessness confirms this conclusion. Although this case, *Flores v. Henderson*, 101 F.4th 1185, 1190 (10th Cir. 2024), had not been decided at the time of the

conduct at issue, it discusses the recklessness standard that applied in the cases Plaintiffs cites

and at the time of the shooting in the present case.[22]

In *Flores*, police responded to a 911 call from a man named Jackson reporting that two

people were dead inside an apartment and that he was holding others hostage. *Id.* at 1190. He

said it was a life-threatening emergency and that his remaining hostages only had a few minutes

left. When the police arrived at the apartment, Jackson's sister answered the door in no apparent

distress. She said her brother was home but did not know whether anyone inside the apartment

was hurt. The officers began to search the apartment and learned that the sister believed Jackson

was alone, unarmed, and might have mental health problems. *Id*. The officers continued down a

hallway to the back bedroom. When the officers reached the second bedroom door, they

announced themselves. *Id.* at 1192. As body camera footage showed,

> The officers remained in the hallway, and never entered into nor saw inside the
> bedroom. Officer Henderson tried to kick the bedroom door open, but someone
> inside seemed to block it. Within seconds, Mr. Jackson rushed from the bedroom
> and moved toward the officers with a machete in hand. Officer Henderson then
> shot and killed him in the hallway outside the bedroom door.

*Id.* (citations omitted). The district court denied qualified immunity, and the Tenth Circuit

reversed.

More specifically, the district court "determined Officer Henderson should not have

rapidly advanced down the hallway and into the back bedroom, but instead should have retreated

or tried to talk with Mr. Jackson, after receiving the radio call that Mr. Jackson might have been

alone, unarmed, and suffering from a mental illness." *Id*. at 1195. In disagreeing, the Tenth

---

[22] As the Tenth Circuit has explained: "We assess qualified immunity in light of the legal rules
that were clearly established at the time the action was taken. . . . But we may examine cases
published after an action was taken to the extent they shed light on the fact that the law was not
clearly established at the relevant time." *Est. of Ceballos v. Husk*, 919 F.3d 1204, 1228 n.4 (10th
Cir. 2019) (cleaned up).

Circuit noted that, at the time the police officers went down the hall and tried to enter Jackson's room, they had reason to believe that the subject may pose a threat to someone inside the apartment or at least that someone may be hurt. *Id.* at 1195. That police officers in *Flores* had reason to believe that Jackson had hostages or murder victims in his room distinguishes *Flores* from the present case. Thus, *Flores* has limited usefulness as a vehicle for factual comparison.

Nonetheless, *Flores* provides useful guidance on the meaning of "recklessness" in cases where a plaintiff predicates an excessive force argument on an officer's alleged recklessness that preceded the use of force. It stated, "Although our cases do not precisely define 'recklessness' in this context, it typically requires a high degree of knowledge that a risk of harm will likely result." *Id.* at 1194. *Flores* further noted, "The inquiry stays objective—we ask whether every reasonable officer would know that his or her conduct recklessly created an unreasonable risk of harm." *Id.* at 1195. In *Flores*, "[t]he risk that Mr. Jackson would rush out of the bedroom with a machete was certainly not known or obvious." *Id.* at 1196.

The *Flores* court then separately concluded, at the second prong of its qualified immunity analysis, that no clearly established law existed to put the officers on notice that their conduct was so reckless that it would render any use of deadly force unlawful. Specifically analyzing *Allen*, the Tenth Circuit wrote, "*Allen* did not put Officer Henderson on notice his decision to proceed down the hallway violated clearly established law." *Id.* at 1198.[23] Similarly, for the reasons discussed above, neither *Allen* nor any other Supreme Court or Tenth Circuit precedent put Officer Ruiz on notice that his decision to remain in the hallway while Wanda opened the bathroom door to check on the welfare of her son violated clearly established law. Nor did any

---

[23] Because *Flores* presented different facts than the present case, the Tenth Circuit distinguished *Allen* on different grounds.

such precedent put Officer Ruiz on notice that his conduct leading up to this point recklessly created the need for him to use force against Max as claimed in Count I of Plaintiffs' complaint. As a result, qualified immunity shields Officer Ruiz from liability under Count I of Plaintiffs' complaint.

### III.   Count III: *Monell* Claim

Defendant City of Albuquerque moves for summary judgment on Count III (municipal liability for excessive force) of the operative complaint. Doc. 41. "[A] municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997). "Instead, in *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Id.* "In later cases, the Supreme Court required a plaintiff to show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). Thus, a *Monell* claim against a municipality has three elements: (1) official policy or custom, (2) causation, and (3) state of mind. *Id.*

Plaintiffs identify the relevant policy as "a policy to dispatch law enforcement, rather than a healthcare provider, to calls like the one involving Max, where no crime had been committed, no violence occurred, and the goal is to get a person in crisis to a hospital." Doc. 53 at 5. The City contests whether this is a policy for which municipal decisionmakers can be liable. Doc. 55 at 5-6. For purposes of this Opinion, the Court assumes, without deciding, that the policy meets *Monell*'s first prong, and focuses on *Monell*'s second and third prongs: causation and deliberate indifference. Because, even drawing all factual inferences in Plaintiffs' favor, no reasonable jury could find for Plaintiffs at the second or third prong, the City is entitled to summary judgment on Plaintiffs' *Monell* claim.

Plaintiffs' causation argument is that, but for the City sending armed law enforcement to Max's house, armed law enforcement would not have shot Max. This might be true. This type of "but for" causation, however, does not satisfy the causation prong in a *Monell* claim. Because Plaintiffs have not alleged that the City's policy of sending armed law enforcement to non-violent, non-criminal mental health crisis calls is itself unconstitutional, the Court must apply the causation element with rigor.  *Schneider*, 717 F.3d at 770 (causation is an especially rigorous standard "when the municipal policy or practice is itself not unconstitutional"); *Brown*, 520 U.S. at 405 ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."). Plaintiffs have not shown a direct causal connection such that this policy was the moving force behind the alleged excessive force. *See Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) ("After establishing a municipal policy or custom, a plaintiff must demonstrate a direct causal link between the policy or custom and the injury alleged." (internal quotation marks omitted)).

As the City points out, Plaintiffs' argument is similar to the argument a plurality of the Supreme Court rejected in *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) (plurality op.). *See* Doc. 55 at 7. There, the plurality noted that, "some limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* will become a dead letter." *Id*. at 823. As the plurality further observed, "Obviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official; for example, [the defendant police officer] would never have killed [the decedent] if Oklahoma City did not have a 'policy' of

establishing a police force." *Id*. Similarly, although Officer Ruiz might not have shot Max if City policy prevented him from responding to the call, that Officer Ruiz did respond to the call does not establish a causal connection between the policy and the excessive force.

Plaintiffs do correctly observe and quote *Schneider* for the proposition that "[c]ausation is generally a question of fact for the jury." 717 F.3d at 778; *see* Doc. 53 at 7. The Tenth Circuit in *Schneider* also made clear, however, that "whether the plaintiff has presented sufficient evidence of causation to defeat a motion for summary judgment is a legal question." 717 F.3d at 778. Here, Plaintiffs offer no evidence that municipal policymakers knew or should have known that dispatching law enforcement to respond to calls involving mental health crises would result in the unconstitutional use of force, and indeed, offer little argument to that effect other than to contend the question should be left to a jury. Doc. 53 at 7; *cf. Schneider*, 717 F.3d at 768 ("A plaintiff must establish the requisite causal connection by showing the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." (cleaned up)). Plaintiffs protest that "the City may argue that the policy of sending law enforcement to all non-violent, non-criminal mental health crises [sic] calls did not cause Ruiz to shoot Max, but that is based on an assortment of disputed factual issues that the jury must resolve." Doc. 53 at 7. However, it is not clear what disputed factual issues exist that, if resolved in Plaintiffs' favor, would enable a jury to find municipal policymakers knew or should have known they would "cause" this shooting by dispatching law enforcement in response to a mental health crisis call when there is no suspicion of a crime. *Schneider*, 717 F.3d at 780 ("Mere speculation . . . is not sufficient to establish causation."). In short, Plaintiffs have failed to provide evidence that supports their contention.

Plaintiffs also fail to establish that, by sending police officers to all non-violent, non-criminal mental health crisis calls, the City exhibited deliberate indifference to the excessive force the City should have known would follow. *Cf. id.* at 769 ("[A] local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." (internal quotation marks omitted)). Plaintiffs do not argue that the City should send no one in response to a 911 call. Instead, they argue that the City should send mental health workers who would use medicine rather than firearms. Doc. 53 at 8. Given that, according to Max's parents, Max's mental health crisis had been brought on by Max's refusal to take his medicine, it is not clear that mental health workers would have been able to administer medicine to Max. Further, Plaintiffs have argued that Max needed to be transported to the hospital, even if it meant forcing him to go against his will, and that first responders should have known that Max might spontaneously erupt into violence. Doc. 36 at 7, 16-17. It is not clear that unarmed mental health workers are best equipped to transport, by force, a mentally ill man whose family expressed concern about him becoming violent during transport.

No one can know what would have happened had the City sent mental health workers instead of police to respond to a 911 call made out of concern that a mentally ill man might become violent. Plaintiffs have, however, failed to present any evidence that a policy of having police respond to such a 911 call constituted deliberate indifference to constitutional violations the City should have known would then almost inevitably ensue.

Because Plaintiffs have failed to present evidence through which a reasonable jury could find in their favor on the second and third prongs of their *Monell* claim, the Court grants the City's motion for summary judgment on this claim.

## IV.   Counts IV and V: State-Law Claims

Defendants Ruiz and the City move for summary judgment on the remaining claims in the First Amended Complaint, Counts IV and V, which arise under state law. Because the Court has dismissed Plaintiffs' federal claims, however, the Court must first decide the threshold question of whether it should decline to exercise supplemental jurisdiction over the state-law claims. The Court has supplemental jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1367. Nonetheless, the Court may decline to exercise supplemental jurisdiction when it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

Here, the Court has resolved Plaintiffs' Fourth Amendment claims against Officer Ruiz and the *Monell* claim against the City of Albuquerque on summary judgment. The Tenth Circuit has indicated that if, prior to trial, "all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) (emphasis added); *see also Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1238 (10th Cir. 2020) (reversing a district court for failing to decline supplemental jurisdiction). Even where the parties have expended considerable effort in litigating the state-law claims in the federal forum, including conducting full discovery, it is appropriate to decline to exercise supplemental jurisdiction because that discovery can be used in state court. *Huntsinger v. Bd. of Dir. of E-470 Pub. Highway Auth.*, 35 F. App'x 749, 759-60 (10th Cir. 2002); *see, e.g.*, *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (affirming a district court decision to decline supplemental jurisdiction after granting summary judgment on the federal claims).

The Tenth Circuit, however, has also indicated that it is appropriate for district courts to decide the state-law claims when resolution of the federal claims "effectively resolves" the state law claims. *Est. of George v. City of Rifle, Colo.*, 85 F.4th 1300, 1323 (10th Cir. 2023). Given that there is no qualified immunity doctrine in state law, and no municipal "policy or custom" requirement governing Plaintiffs' state law claims, the Court's summary judgment ruling does not necessarily resolve them. In addition, it is more appropriate for the state court to resolve questions about the preclusive effect of its own orders. *See* Doc. 36 at 43-45 (outlining these questions).

The Court therefore declines supplemental jurisdiction over Plaintiffs' remaining state-law claims and remands them to state court.

## <u>CONCLUSION</u>

The Court GRANTS IN PART and DENIES IN PART Defendant Jose Ruiz's Motion For Summary Judgment Requesting Dismissal Of Counts I, II, And IV Of Plaintiffs' Amended Complaint, And Memorandum In Support (Doc. 26) and Defendant City Of Albuquerque's Motion For Summary Judgment Requesting Dismissal Of Plaintiffs' Amended Complaint, And Memorandum In Support (Doc. 41). Specifically:

- The Court grants summary judgment in Defendants' favor on the federal claims (Counts I, II, and III of the First Amended Complaint), which are hereby DISMISSED; and

- The Court REMANDS the state-law claims (Counts IV and V) to state court.

SO ORDERED.

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE